Hickox
*v.*
Parmelee.

Hickox and another *against* Parmelee and another.

On a stream of water issuing from a large natural pond were mills owned respectively by *A* and *B ;* the mill nearest the outlet of the pond being owned by *B*, and that below by *A*. Both *A* and *B* claimed under *C*, who, in 1800, owned the land, at the outlet of the pond and below, and erected mills on the site of *A's* mill. About the same time, *C*, in conjunction with other mill-owners below, erected a dam, flume and gate, at the outlet of the pond, deepening and widening the channel, for the purpose of controuling the water there, for the more advantageous use of it for their mills. *B's* mill was erected in 1834 ; before which *C* and the other mill-owners had claimed and exercised the exclusive right to dam up and controul the water at the outlet of the pond, without obstruction. In an action brought by *A* against *B*, for obstructing the water at *B's* mill, it was held, 1. that the acts of *C*, for such a period, unexplained by any circumstances which deprived them of an adverse character, constituted a conclusive presumption of a grant from *C* to the mill-owners below of a permanent right in them, conjointly with *C*, to construct those works and use them for that purpose, thereby qualifying the natural rights of *C* as riparian proprietor ; 2. that *C*, by such acts, did not acquire any new or additional right, to the exclusion of, or in preference to, those who might subsequently become, under him, intermediate owners on the stream ; because *C*, being the owner, not only of the land on which his mill stood, but also of that between it and the outlet of the pond, his unity of ownership would prevent the acquisition by him of any such new or additional right ; 3. but that, where *C*, while he owned *A's* mill, practically attached and appropriated to himself the privilege now claimed by *A*, and continued to exercise that privilege, for the use and benefit of his mill, down to the time when it was conveyed to *A*, such privilege became, and is to be considered, parcel of the mill estate, and passed, as such, from *C* to *A*, by the conveyance to him of such estate ; consequently *B*, by the subsequent conveyance from *C* to him of a mill site on the same stream, took only an estate modified by the privilege so attached to *A's* mill.

Where it appeared, in such case, that *D*, who purchased of *C*, and through whom both parties claimed title, was present when *B* erected his works and made the obstructions complained of, and did not object thereto ; it was held, that such conduct of *D* did not estop *A* to deny the right of *B* to do those acts, nor prove a license to *B* to do them.

Where it also appeared, that *D*, in his conveyance to *B*, " reserved" the right of entering on the land conveyed, " for the purpose of erecting a dam in the mouth of the pond, and drawing water therefrom ;" it was held, 1. that if that clause was to be deemed a technical reservation, it would enure to the benefit of *D*, as owner of the land unconveyed by that deed, and of his grantees of *that* land, being attached to the *estate* retained by *D*, and not to him personally ; but 2. that this clause was not intended as a reservation, but was inserted in the deed, only for the purpose of protecting the grantor, on his covenant against incumbrances, from any liability on account of the right or privilege which *A* might claim to be attached to his mill.

In a motion in arrest of judgment, for the misconduct of one of the jurors, it appeared, that during the progress of the trial, just before the assembling of the court, after an adjournment at noon, a map or diagram of the pond and of the stream issuing therefrom, with the dam and flume at the outlet, constructed by engineers employed by both parties, and previously used before the jury, was lying upon the bar table; and one of the jurors coming in, took it up, and while he was examining it, *T*, one of the witnesses who had testified in the cause, and one of the mill-owners on said stream below the plaintiff, and of course, interested in the question, took hold of the map and turned it around, saying to the juror, that he would understand it better if it was turned around, and then pointed to certain localities marked upon it. The interview betwen *T* and the juror continued, in a low voice, for two or three minutes, in the presence, but not within the hearing, of the sheriff, clerk, and some of the members of the bar. *T'* testified, that he did not know that the juror was one; and the juror testified, that what was said and done had no effect upon his mind, and no influence upon the verdict. Held, with some hesitation, that the verdict ought not to be disturbed.

*Litchfield,* June, 1851.

Hickox
*v.*
Parmelee.

THIS was an action on the case for the obstruction of a water-course.

The declaration contained several counts, the second of which alledged, that the plaintiffs were the owners of a certain grist-mill and saw-mill, and of the premises on which they were situated, on *East Aspetic* river, in the town of *Washington;* that said river, at the time of committing the grievances hereinafter mentioned, had flowed, and been accustomed to flow, and of right still ought to flow, in great abundance, to the said mills and premises of the plaintiffs, for supplying them with water necessary to work them; that the plaintiffs, (in common with other mill-owners upon that stream,) had been accustomed to controul, and have still the right to controul the waters of said stream, at a place above the premises of the plaintiffs, where said stream issues from a pond, called *Waramaug* pond, by means of a gate, and flume, and dam, at that place; that the plaintiffs, in common with other mill-owners on said stream, had been accustomed to regulate and controul, and had a right, and still have a right, to regulate and controul the waters of said stream, for the benefit of the mills of the plaintiffs and said other mill-owners, by damming up the waters of said pond, in times of plenty of water, and by letting them out in times of scarcity, as they were wanted for said mills; yet that the defendants, well knowing the premises, and contriving to injure the plaintiffs, did, on the 1st of *May,* 1848, by means

of a dam across said river, and a flume, gate and other obstructions, placed in said stream above the premises of the plaintiffs, and below the dam and flume and gate first abovementioned, *obstruct and impede, and have ever since* obstructed and impeded, the course of said stream, and prevented the waters from coming to the mills of the plaintiffs, and dammed up the waters of said stream so as to prevent them from flowing, in their accustomed and rightful manner, to said mills of the plaintiffs, so as to prevent their regulating and controuling, in the manner as before stated, they were accustomed and had right to do, the waters of said stream; whereby the plaintiffs have been deprived of their just rights, and prevented from enjoying the use of said stream, and have been greatly injured and obstructed in their business at said mills.

The cause was tried, on the general issue, at *Litchfield, August* term, 1850, before *Church,* Ch. J.

On the trial, it appeared, that the plaintiffs and other persons were the owners and occupiers of mills of various kinds and used for various purposes, on a stream of water, called the *East-Aspetic* river, in the town of *Washington,* which issued from a pond of water, called the *Waramaug* pond; and the defendants were the owners and occupiers of a furnace on said river, above the mill of the plaintiffs, and above all the other mills on that stream, and nearest the outlet of the pond.

The defendants claimed the right, as riparian proprietors, to do the acts complained of, and if not, that by virtue of documents and deeds produced in evidence, they had a special right to the exclusive use and controul of the water, at the outlet of the pond, for the use of their said furnace, and a right to erect their dam and flume, and to use the same as they had done.

Both parties claimed under *William* and *Stephen Cogswell,* who owned the land at the outlet of the pond, and who erected a grist-mill and saw-mill on the site where the plaintiffs' mills now stand, as early as the year 1800, and under whom the plaintiffs claim.

The defendant's furnace was erected as early as the year 1834.

The plaintiffs also claimed, on the trial, and offered evi-

dence to prove, that from time immemorial there were mills along said stream, below where the defendants' furnace now stands, and among others, the mills of the plaintiffs, erected by *William* and *Stephen Cogswell ;* and that from time immemorial, and for more than fifteen years before the erection of the defendants' furnace, the owners of said mills had claimed the exclusive right to dam up and controul the water at the outlet of the pond, for the use of the mills on said stream, without any obstruction from the *Cogswells,* or any body else, until the time of the acts complained of by the plaintiffs.

It was agreed, that the title of the plaintiffs to their mills was derived, by legal conveyances, from *William* and *Stephen Cogswell,* and that the immediate grantor of the plaintiffs was *Joseph H. Bennet,* who conveyed to the plaintiffs, by deed, dated *February* 1st, 1847.

The defendants claimed, and offered evidence to prove, that *William* and *Stephen Cogswell,* during all the time they were the owners of the land and mills, now of the plaintiffs, were also the owners and occupiers of the land now occupied and claimed by the defendants, and on which the defendants' furnace is situated ; and it was admitted, that all the right and title of the *Cogswells* to said land had come down to the defendants, unless the same had been modified, as claimed by the plaintiffs.

It was agreed, that upon the death of *William Cogswell,* there was distributed from his estate to his son, *Theodore Cogswell,* the one-half of the mill privilege at the outlet of the pond, and one-half of the grist-mill, &c., now owned by the plaintiffs ; and that *Theodore Cogswell* conveyed the same to said *Joseph H. Bennet,* by his deed, dated 27th of *February,* 1828.

It was also agreed, that *Stephen Cogswell* conveyed to said *Bennet* the other half of the mills now owned by the plaintiffs, together with the one-half of the privilege at the outlet of the pond, by his deed, dated 29th *February,* 1828.

To prove the right and claim of the mill-owners on said stream, under the second count in their declaration, the plaintiffs offered *Abijah Tomlinson,* one of said mill-owners, to testify, that while *William* and *Stephen Cogswell* were, with others, mill-owners on said stream, and owned and oc-

cupied the mills now of the plaintiffs, and also owned the land at the outlet of the pond, said mill-owners, from time to time and from year to year, as far back as forty-nine or fifty years ago, controuled the water at the outlet of the pond, for the benefit of the mills below, and had, at a joint expense, erected a dam and flume at the outlet, and from time to time had deepened and made wider the channel at the outlet and below, at all times, under a claim of right to do the same.

To this evidence the defendants objected ; but the court admitted it.

It was agreed, that *Joseph H. Bennet*, by his deed dated *July* 18th, 1834, conveyed to the *Waramaug Iron Company* the land on which the defendants' furnace is erected, and by which company the same was built, and from which company the defendants, by several intermediate conveyances, executions, &c., have derived title.

This deed contained the following reservation, or qualification of the grant : " It is understood, that said *Bennet* does not intend to convey a right (provided such a right now exists,) across the said land, immediately below the outlet of the pond, for a public highway ; and reserves the right of entering on said land, for the purpose of erecting a dam in the mouth of the pond, and drawing water therefrom."

And it was also agreed, that *Bennet*, when said furnace was erected, was a stockholder in the *Waramaug Iron Company*, and resided in the vicinity of the furnace, and, at the same time, was the owner of the mills now of the plaintiffs.

And the defendants offered evidence to prove, and claimed they had proved, that while said company was erecting the furnace, and their dam and flume, *Bennet* saw and knew the progress of the work, and made no objection to the erection of the same, or the manner in which it was built and finished ; and thereupon they claimed, that *Bennet*, and the plaintiffs claiming under him, are estopped to deny the right of the *Waramaug Iron Company* to erect said dam and flume, as they were erected and finished ; and also are estopped to deny the right of the defendants to keep up and use said dam and flume as they are kept up and used, and of which the plaintiffs complain. And also, that *Bennet*, by not objecting as aforesaid, gave liberty and license to the *Wara-*

*maug Iron Company* thus to erect and keep up and use said dam and flume ; which license could not be revoked, either by *Bennet* or the plaintiffs ; and prayed the court so to charge the jury.

The court did not charge as requested, but instructed the jury, that as *Bennet,* by his deed to the *Waramaug Iron Company,* did not specify the elevation to which that company might erect their dam and flume, neither he nor the plaintiffs are estopped thereby, as the defendants claim ; and also, although *Bennet* was a stockholder in said company, and witnessed the progress and finishing of the dam and flume, without objection ; yet he was not, nor are the plaintiffs, estopped, as the defendants claim, unless he *knew* the elevation of the dam and flume, and had good reason to believe, that, thus erected, they would set back the water, and would improperly obstruct the flow of the water to his own mill and the other mill below ; nor would his silence as aforesaid amount to a license to the *Waramaug Iron Company* to erect their dam and flume so as unnecessarily to obstruct the flow of the water from the pond to the mills below, as claimed.

It was agreed, that when *Bennet* conveyed to the *Waramaug Iron Company,* he conveyed all the land he owned at the outlet of the pond, and upon said stream, except the land and mills now of the plaintiffs ; and yet the defendants claimed, that by the deed of *Bennet* to the *Waramaug Iron Company,* he reserved a right to himself, and for himself, to enter upon the land at the outlet of the pond, for the purpose of erecting a dam at the mouth of the pond, and to draw water therefrom, which right still remains in him, notwithstanding his deed to the plaintiffs ; and therefore, neither the mill-owners nor the plaintiffs have such right as they now claim ; and prayed the court so to charge the jury.

The court did not so charge, but did charge that said deed from *Bennet* to the *Waramaug Iron Co.* should be construed in reference to the foregoing facts, and the condition of the property, as proved in the case ; and in view of these, the reservation in the deed of *Bennet* to said company was not to be understood as retaining any right to the exclusive use or controul of the water against said mill-owners, or to do the acts complained of ; but was intended only to apprise

*Litchfield,*
June, 1851.

Hickox
*v.*
Parmelee.

the grantees in said deed of the existence of an incumbrance, and to protect the grantees from liability on the covenants in said deed ; and also, if *Bennet* did then retain any such right in himself, that it was conveyed to the plaintiff, by his deed.

It was agreed and proved, that after the erection of the furnace, by the *Waramaug Iron Company*, that company carried on the furnace, using the water, without complaint by said mill-owners, for about two years, when said company failed, became insolvent, and assigned said property to a trustee for the benefit of creditors, before which time, *viz*, on the 7th day of *May*, 1837, said company had mortgaged said property to *Bennet* and others ; and the defendants derive their title from the mortgagees, trustee and various liens of executions, &c., from the *Waramaug Iron Co.;* and that the deed under which they make immediate claim, and from which they directly claim title, is from *Gilbert* and *Adrian.*

And the court further charged the jury, that if they should find from the evidence, that the plaintiffs and those under whom they had derived their title to their mills, had, for a period of more than fifteen years, either by themselves, or in common with the other mill-owners on said stream, exercised the right of regulating and controuling the water of the pond, at the place and in the manner in their declaration mentioned ; or if they should find, that *Bennet*, at the time of his conveyance to the plaintiffs, was the owner of such right ; and then if they should further find, that the defendants had, by their works on said stream, in the manner complained of, by the plaintiffs, in their declaration, unnecessarily obstructed the plaintiffs in the exercise and enjoyment of their rights, to their injury ; or if they should find, that the defendants had, in the manner complained of, by the plaintiffs, obstructed the natural flow of the waters of said stream unnecessarily, or for an unreasonable time, to the injury of the plaintiffs, their verdict should be for the plaintiffs ; otherwise, for the defendants.

The jury returned their verdict for the plaintiffs ; and the defendants thereupon moved for a new trial.

The defendants also filed a motion in arrest of judgment, on which the court found the following facts.

Upon the trial of the cause, there was used a map or

diagram of the *Waramaug* pond, the outlet and the stream is- <span>*Litchfield,*</span>
suing therefrom ; also the dam and flume at the outlet ; and <span>June, 1851.</span>
also the furnace dam and flume of the defendants, together
with the mills on the stream below.   This map was con-
structed by engineers employed by both parties.   The sev-
eral localities referred to by witnesses, were designated
thereon, by writing.

During the progress of the trial, and just before the as-
sembling of the court after the adjournment at noon, this
map was lying upon the bar table, and while so lying, *An-
drew Root*, one of the jurors impanelled and sworn in the
cause, came into the court room, and was examining the
map, as it was lying upon the bar table ; and while he was
thus examining it, *Abijah Tomlinson*, who was one of the
witnesses who had testified in the cause, and was one of the
mill-owners mentioned in the plaintiffs' declaration, and in-
terested in the cause in favour of the plaintiffs, came up to
him, and took up the map, and turned it around, and said, to
the juror, that he would understand it better, if it was turn-
ed around, and then, with his finger, pointed to certain local-
ities delineated on the map, especially the *Waramaug* pond,
the outlet of the pond, the dam, and the stream running
*South* from the pond and the flume.

The juror asked no questions of *Tomlinson*, nor did *Tom-
linson* ask any questions of the juror.   This interview be-
tween the juror and *Tomlinson* continued, in a low voice,
for two or three minutes, and until the assistant clerk of the
court interfered, by directing the attention of the juror to
the juror's oath in the statute book.

All this was in the presence, but not in the hearing, of the
assistant clerk, the sheriff and two or three members of the
bar.

If any thing else was said by either the juror or *Tomlinson*,
it was not heard by others, and is not known.   Nothing
more was recollected, by either the juror or *Tomlinson*.

*Tomlinson* testified, that he did not know Mr. *Root* to be
a juror, or did not then recognise him as such ; and the juror
testified, that what was done and said had no effect upon
his mind, and no influence upon the verdict.

Neither of the parties knew of this interview until after
the verdict had been rendered.

<span>Hickox</span>
<span>*v.*</span>
<span>Parmelee.</span>

Upon these facts the motion was reserved for the opinion of this court on the question whether they constituted a sufficient ground for setting aside the verdict.

*Sanford* and *J. H. Hubbard*, in support of the motion for a new trial, contended, 1. That *Tomlinson's* testimony was immaterial. In the first place, to acquire a right to the use of water, by occupancy, the occupancy must be *adverse.* *Ang. Water, c.* 85. Secondly, the *Cogswells* and their grantees, down to 1834, owned both mill sites together. No easement in the upper one could be acquired by them, so as necessarily to attach to the lower one. Thirdly, the other mill-owners exercised the right only *with* the owners of the upper site, and so it was not adverse.

2. That the charge was wrong as to the estoppel created by the conduct of *Bennet.* He stood by and saw the defendants expend their money, without objection, and under his own grant. He and his grantees are estopped to deny the right of the *Waramaug Iron Company* to erect and keep up their dam, &c. *Baldwin* v. *Porter,* 12 *Conn. R.* 473. 482. *Kinney* v. *Farnsworth,* 17 *Conn. R.* 355. 361. *Starr* v. *Anderson,* 19 *Conn. R.* 338. 342. *Stow* v. *Wyse,* 7 *Conn. R.* 214. 220. He was bound to know how the defendant's dam would affect his rights.

3. That the construction given by the court, in its charge, of the reservation in *Bennet's* deed, was wrong. In the first place, it is, in its terms, of a valuable right, in no way qualified or restricted. Secondly, there were no facts or circumstances in the case, nor any thing in the condition of the property, which warranted the construction given.

4. That *Bennet's* deed to the plaintiffs, does not convey the right claimed by them. The subject matter of the grant is specifically described, by metes and bounds, in that part of the deed which embraces the *premises ;* and nothing not within the boundary, or naturally or necessarily appurtenant thereto, passes. *Manning* v. *Smith,* 6 *Conn. R.* 289. 292. *Hatch* v. *Dwight* & al. 17 *Mass. R.* 297, 8. *Grant* v. *Chase* & al. *Id.* 447.

5. That the charge as to fifteen years occupancy, is wrong. In the first place, there was, at all times, *unity of possession as to* both sites ; and so the plaintiffs, by *their* occupancy,

could not acquire any thing. Secondly, the other mill-own-
ers always occupied *with* the plaintiffs and their grantors,
and so not *adversely*. Thirdly, the jury were told, that the
*mere* occupancy for fifteen years, was enough—not the ad-
verse occupancy.

6. That the charge withdrew from the consideration of
the jury the claim of a special right to do the acts com-
plained of, under the documents and deed upon which they
relied. The court instructs the jury, that if the defendants
have obstructed the natural flow of the water, for an unrea-
sonable time, or unnecessarily, &c.—*i. e.* if they have done
any thing not justified under their legal rights as riparian
proprietors, then their claim of right to do so, must be dis-
regarded.

7. That the motion in arrest ought to be sustained. In the
first place, the conduct of the juror was a violation of his
oath. *Stat.* 525. Secondly, *Tomlinson* was a *party in in-
terest :* that is fatal. *Pettibone* v. *Phelps*, 13 *Conn.* 450, 1.
*Wilson* v. *Abrahams*, 1 *Hill*, 11. Thirdly, the interview
was of a very *suspicious* character. It was carried on in a
low tone ; lasted two or three minutes ; and much more
must have been said than was disclosed. Fourthly, it was
impossible for the juror to say, that it had no influence on
the verdict ; and the court does not *find* that it had none.
It might have had ; and that is enough. *Hix* v. *Drury*, 5
*Pick.* 302. *Benson* v. *Fish*, 6 *Greenl.* 141. *Pettibone* v.
*Phelps*, 13 *Conn. R.* 451. An important principle of public
policy is involved, which can be sustained only by setting
aside all verdicts obtained under such circumstances.

*Seymour*, (with whom was *Chittenden*,) contra, contended,
1. That the testimony of *Tomlinson* was admissible. It
went to establish a dedication, *by* all interested in the stream,
*to* all interested therein, of certain rights. If one person
happens to unite in himself the ownership of two privileges,
is he therefore excluded from the common benefit, or does
he thereby escape subjection to the common burden ? In
such cases, the common use of the reservoir and stream, in
a particular way, for a long period of time, becomes the
*acquired* law of the stream, as a substitute for the original

*Litchfield,*
June, 1851.
_____

Hickox
*v.*
Parmelee.

natural law.  *Nicholas* v. *Chamberlain, Cro. Jac.* 121.  *Haz-ard* v. *Robinson,* 3 *Mason,* 272.

2. That the plaintiffs are not estopped, by any acts of *Bennet.*

3. That the court, on the trial, gave the right construction to *Bennet's* deed to the *Waramaug Iron Company.*

4. That the motion in arrest ought not to prevail.  It is now the settled doctrine, that the plaintiff is not to lose the benefit of his verdict, unless he, or some agent of his, is guilty of some fault; or unless the defendant has, or may have, suffered from the misconduct of the juror.  *Pettibone* v. *Phelps,* 13 *Conn. R.* 445.  Here was clearly no fault in the plaintiff.  There was no fault in *Tomlinson* even.  He did not know that *Root* was a juror.  No injury has been suffered by the defendant.  The conversation, though relating to the cause, was not upon its *merits;* nor did it, in any manner, involve its merits.  The map and localities had been surveyed and marked, by an engineer employed by *both parties,* and were, in no manner, the subject of any disagreement or controversy.  The juror expressly swears, that it had no effect on his mind, and no influence on the verdict.  The attending circumstances repel all suspicion of sinister design.  The *place* was the court room; the *time* was mid-day; and the *spectators* were the sheriff, the clerk and the members of the bar generally.

STORRS, J.  The right of controuling the water of the stream in question, for the benefit of the plaintiffs, in derogation of the rights of the defendants, whose works are situated between the mills of the plaintiffs and the outlet of the pond from which the stream issued, which the plaintiffs set up in the second count of the declaration, under which alone the rulings were made of which the defendants complain, and which it was necessary for the plaintiffs to prove, in order to recover under that count, was one of a special, or as it is termed artificial character, and to which, therefore, the plaintiffs would not be entitled *ex jure naturæ,* as incident to the ownership of their mills.

Both of the parties claim title to their respective mills, although not immediately, under *W. & S. Cogswell,* who built the mills of the plaintiffs, while they were the owners of all the land at and below the outlet of the pond down to

the lower boundary of the plaintiffs' land, and therefore including the land of both the parties on which their mills stand; and in considering the objection of the defendants to the competency of the evidence objected to by them, and received by the court below, the intermediate conveyances, between the *Cogswells* and the parties in this suit, may be disregarded, and the case viewed as if the parties derived their title immediately from the *Cogswells;* since nothing has occurred, so far as this point is concerned, to vary the rights of either of the parties from what they would have been, if they had derived their title immediately from the *Cogswells*, or, in other words, as they existed when the latter parted with the property to those under whom the parties less remotely claim.

While the *Cogswells* owned all the land between the outlet of the pond and the adjoining land of the mill-owners below, the acts of those mill-owners, in conjunction with the *Cogswells*, and at their joint expence, in erecting a dam, flume and gate at said outlet, and deepening and widening the channel there and below, for the purpose of controuling the water at said outlet for the first use of their mills, and the continued use of those works for that purpose, by them, for the benefit of their mills, for the period of fifteen years, under a claim of right so to do, unexplained as it is, in the present case, by any circumstances which deprive these acts of an adverse character, constituted a conclusive presumption of a grant from the *Cogswells* to the mill-owners below of a permanent right, in conjunction with the *Cogswells*, to construct those works and use them for that purpose; the effect of which was, to abridge the right of the *Cogswells* to the use of the water of the stream between the outlet of the pond and their mills, in such a manner that they could not interfere with the right so acquired, by such presumed grant, and therefore, to diminish, to that extent, their previous natural rights, as riparian proprietors on the stream. The effect of such grant, however, was merely an abridgment of the rights of the *Cogswells* to that extent; and, excepting so far as it had that effect, it left their rights in the stream the same as they had previously existed. It did not confer upon them, nor did they acquire thereby, on the ground of contract or

prescription, any new or additional right to construct or use the works at the outlet of the pond, for the purpose of controuling the water of the stream, for the benefit of their mills, to the exclusion of, or in preference to, those who might subsequently become, under them, intermediate owners on the stream ; because the *Cogswells* being the proprietors, not only of the land on which their mills stood, but also of that between them and the outlet of the pond, their unity of ownership would, on a well established and familiar principle, prevent the acquisition by them of any such new or additional right.   Any such acquisition must have been from themselves, which is legally impossible.   They could not thus add to the plentitude of their ownership.   Therefore, the right claimed by the plaintiffs, under, or by virtue of their conveyance from the *Cogswells*, to controul the water of the stream between the outlet and their mills, for the benefit of those mills, to the exclusion of the right, claimed by the defendants, to the use of the water, for the benefit of their furnace, which is situated between said outlet and mills, cannot be sustained, upon the ground that the *Cogswells*, or the plaintiffs claiming under them, have acquired any such right to controul the water, by an agreement between the latter and the mill-owners below, or by an adverse enjoyment thereof, which would amount to, or be evidence of, a grant for that purpose.

But there is another ground, on which, by the conveyance from the *Cogswells* to the plaintiffs, of the land and mills of the latter, the right of controuling the water above those mills might pass to the plaintiffs and become vested in them, and prevail over any conflicting rights claimed by the defendants to the use of the water for their furnace, which was erected by them subsequent to the erection of the mills of the plaintiffs.   If, while the plaintiffs' mills were owned by the *Cogswells*, the latter practically attached and appropriated to them the privilege of controuling and regulating the water above, which the plaintiffs now claim a right to exercise, by constructing themselves, or in conjunction with the mill-owners below, the works at the outlet of the pond, and deepening and widening the channel there, for that purpose, and thenceforth continued to exercise that privilege, by means of such works, in connexion with, and for the use and benefit of those mills, down to the time, when they conveyed

to the plaintiffs, we are of opinion, that such privilege became, and is to be considered, parcel of the estate of which those mills formed a part, and passed as such from the *Cogswells* to the plaintiffs, by that conveyance ; and the effect of the conveyance to the defendants of the other portion of the property, on which their furnace stands, was only to convey to them such property, as it was then modified by the privilege so attached to the mills of the plaintiffs. If, after that privilege was so attached to those mills, it had been withdrawn or severed from them, by the *Cogswells,* while they owned the property above, as they had a right to do, and their mills had thus been deprived of it, as it would have ceased to be attached to them, or to subsist in connexion with them, it would no longer have been parcel of the estate, and, therefore, would not have passed, by the conveyance of it. These principles are fully established, by the cases of *Nicholas* v. *Chamberlain, Cro. Jac.* 121. and *Carey* v. *Daniels,* 8 *Metc. R.* 466. which bear a very close analogy to the present, and are distinctly recognized and approved, in *Hazard* v. *Robinson,* 3 *Mason's R.* 272. and the cases therein referred to.

The testimony of *Tomlinson,* which was offered by the plaintiffs, tended directly to prove the right set up in the declaration, by shewing the existence of such a privilege connected with their mills, and was therefore properly admitted.

2. The defendants claim, that the conduct of *Bennet,* (who purchased from the *Cogswells,* and under whom both parties claim title,) in remaining silent and interposing no objections, while the *Waramaug Iron Company,* ( who purchased of *Bennet* previously to the plaintiffs, and under whom the defendants immediately claim title,) were constructing their works, of which the plaintiffs now complain, although he was observant of what said company were then doing, estopped *Bennet,* and therefore precludes the plaintiffs, from alledging that said company encroached, by means of said works, on the rights now claimed by the plaintiffs ; or, at least, amounted to a license from *Bennet* to said company, irrevocable by him, and consequently by the plaintiffs, to construct those works. We think, that the defendants have no reason to complain of the charge below on this point, but that it was

rather over favourable to the defendants than otherwise. We are not aware of any principle of law, by which *Bennet* was obliged to interfere with the acts of his grantee, on peril of losing his rights.    His conduct would amount only to evidence on the question whether such acts were done with his license ; and there is no complaint that the defendants had not the advantage of it, for that purpose, before the jury. *Johnson* v. *Lewis,* 13 *Conn. R.* 307.

3. We perceive no error in the charge below, on the construction or effect of the clause in the deed from *Bennet* to the *Waramaug Iron Company,* which was claimed to be a reservation for the benefit of the former.    If that clause is to be deemed a technical reservation, it would enure to the benefit of *Bennet,* as the remaining owner of the land on the stream unconveyed by that deed, and of his grantees of that land, which, in this case, were the plaintiffs.    It would be attached to the estate retained by *Bennet,* and not to him personally.    But on the construction of it by the defendants, it gave to *Bennet* the right to controul the water of the stream after he had divested himself of the property to which it was appurtenant.    This view of it is unsupported, by reason or authority.    We concur, however, in the opinion expressed by the judge on the trial, that that clause was not intended as a reservation ; but that it was introduced into the deed only for the purpose of protecting *Bennet,* the grantor, on his covenant against incumbrances, from any liability on account of the existence of the right or privilege claimed by the plaintiffs, on the trial, as before mentioned, to be attached to their mills, by virtue of the conveyance to them by *Bennet.*

4. On the remaining question, whether the verdict should be set aside, on account of the misconduct of the juror, we have come to the conclusion, although not without some hesitation, that it ought not to be disturbed.    That hesitation has arisen from the difficulty, generally, of ascertaining that the mind of a juror was not influenced, by the communication of another person, although the juror himself is sensible of no such effect, and is even so confident that there was none, that he does not hesitate to deny it, in his testimony. But in this case, there was nothing in the character of the communication itself, which would have a necessary, or

even probable, tendency to bias the opinion of the juror, although it is possible that it might have that effect. And the communication to him was of that peculiar kind, that we are induced to think that he could judge correctly on the point whether he was so biassed; and that full credit ought, therefore, to be given to him, when he testifies, that he was not. What took place between him and *Tomlinson* was highly reprehensible, and a violation of duty in both; but it appears to have been the result of thoughtlessness, and not any improper motive. If the latter were one of the plaintiffs in the action, or their agent, we should not hesitate to set aside the verdict, whatever may have been the character of his communication. Such however was not the case. He had no interest in the event of the suit, although he was a mill-owner below the plaintiffs, and therefore, at most, had only what is termed an interest in the question. 13 *Conn. R.* 445.

A new trial, therefore, is not advised.

In this opinion the other Judges concurred.

New trial not granted.

Judgment not arrested.